In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3769

MARY SALLENGER, as the
Administrator of the Estate of
ANDREW B. SALLENGER, deceased,

*Plaintiff-Appellant,*

*v.*

CITY OF SPRINGFIELD, ILLINOIS, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:03-cv-03093—**Jeanne E. Scott**, *Judge.*

ARGUED FEBRUARY 9, 2010—DECIDED DECEMBER 17, 2010

Before POSNER, ROVNER, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Andrew Sallenger, 35, suffered from bipolar disorder and schizophrenia, and in the early-morning hours on April 30, 2002, he experienced a psychotic episode while staying at his mother's house in Springfield, Illinois. A family member called 911 and reported that he was screaming and "running around the

house naked" in an agitated and uncontrollable state. Three Springfield police officers responded to the scene, and a violent struggle ensued. The officers eventually subdued Sallenger and restrained him in a "hobble"—essentially a cord that is looped around a suspect's lower legs and then connected to a strap that is attached to handcuffs. A few minutes after he was hobbled, Sallenger stopped breathing. The officers removed the hobble, attempted CPR, and called for an ambulance, but Sallenger never regained consciousness. He was later pronounced dead at the hospital.

Sallenger's estate brought several state and federal claims against the three officers and the City of Springfield, but only two are relevant on this appeal: (1) a claim against the officers for inadequately responding to Sallenger's medical needs during the course of the arrest, in violation of the Fourth Amendment and made actionable under 42 U.S.C. § 1983; and (2) a claim against the City under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for failure to train the officers in how to use hobbles. The district court entered summary judgment for the defendants on both claims. The Estate contends this was error. It was not. The record is clear that the officers began CPR and called paramedics as soon as they realized Sallenger was not breathing, and this satisfies the Fourth Amendment's reasonableness standard. As for the *Monell* claim against the City, it is linked to the Estate's excessive-force claim against the officers for improper use of the hobble. That claim was tried to a jury after qualified immunity was denied, and a no-liability verdict was

rendered for the officers. Because the officers did not violate Sallenger's Fourth Amendment rights by the way in which they used the hobble, the City itself cannot be liable under *Monell* for failure to properly train them in the use of the device.

## I. Background

This case is before this court for a second time. Our first decision, *Sallenger v. Oakes*, 473 F.3d 731 (7th Cir. 2007), affirmed the district court's denial of the officers' motion for summary judgment based on qualified immunity. That decision contains a full factual account of the case; we will review here only those facts pertinent to this appeal. On April 30, 2002, Andrew Sallenger was staying with his mother, Mary Sallenger, at her home in Springfield. Kim Nolan, Sallenger's sister, was also staying at the home, together with her four children. Sallenger was a schizophrenic and also suffered from bipolar manic depression, and he experienced a psychotic episode in the early-morning hours on April 30. Nolan called 911 at 1:49 a.m. and told the dispatcher that her brother had woken everyone up screaming and "breaking all kinds of stuff." She said he was "very psychotic" and was "running around the house naked in front of the kids and everything." She also told the dispatcher that responding officers would "need a lot of backup because he is out there bad and he's very strong." Three Springfield police officers were dispatched to the scene.

Sergeant James Zimmerman, Officer Brian Oakes, and Officer Jason Oliver arrived shortly after 2 a.m., and

Nolan quickly informed them of Sallenger's condition. The officers entered the house and found Sallenger in a bedroom, in the physical and mental state Nolan had described. The officers approached to try to subdue and arrest him, and a violent struggle took place. Sallenger was, as Nolan had suggested, very strong; at 6 feet tall and 262 pounds, he was also a very large man. The officers used pepper spray, physical blows, and pressure-point techniques in response to Sallenger's strenuous resistance. They eventually managed to handcuff Sallenger, and then restrained him in the hobble. After Sallenger was hobbled, Sergeant Zimmerman emerged from the bedroom to wash pepper-spray residue from his eyes. According to Nolan's version of events, a few minutes later she heard her brother scream three times. She went into the bedroom, saw that he was not breathing, and yelled, "you killed my brother." The officers' version is a little different, but all parties agree that within minutes of being hobbled, Sallenger stopped breathing. When the officers realized this, they removed the hobble, started CPR, and called for paramedics.

At the time of the incident, the City permitted officers to use hobbles in cases in which a suspect in custody is displaying or has indicated signs of a hostile and combative nature. But the City did not specifically train its officers in how to use them. The hobble used on Sallenger was not issued by the City; rather, Officer Oakes purchased it from a retail website. Oakes had read the instructions that came with the hobble and had seen other officers use them. Zimmerman testified that

he was aware that restraining a suspect in a hobble could cause positional asphyxiation if the suspect was not turned on his side.

The main point of contention in this appeal is *not* the officers' use of the hobble (more on that in a moment) but whether the officers responded appropriately once they realized that Sallenger was not breathing. Springfield Police Lieutenant Mark Bridges arrived on the scene within minutes of the hobbling, and the three officers testified that it was at this point—just after Bridges arrived—that they realized Sallenger was not breathing. All four officers— Zimmerman, Oakes, Oliver, and Bridges—testified that they immediately removed the hobble, began CPR, and summoned an ambulance. Nolan's testimony also supports this account.

The Estate contends, however, that there was a seven-minute lag between the time the officers realized Sallenger was unconscious and the time they began to administer medical aid. As support for this contention, the Estate relies on a transcript from the recording of the calls made on the police radio during the course of this incident. The transcript reflects that at 2:15 a.m. a radio call was made from an unidentified officer who said, "white male, late 30's [sic], unconscious, unresponsive." It also reflects a radio call from Lieutenant Bridges reporting, "I'm out at the scene." This call is logged at 2:22 a.m. The Estate infers from the timing of these radio calls that the officers on the scene realized Sallenger was unconscious at 2:15 a.m.—seven minutes *before* Lieutenant Bridges arrived—but did nothing.

Lieutenant Bridges testified, however, that it would be wrong to equate the logged time of his radio call to the actual moment he arrived at the scene. Events were chaotic and moving rapidly, and when he arrived, his attention was focused on assisting the officers at the scene; the time of his radio call reflects only the point in time at which he paused to call in his arrival to the dispatcher. The call log also reflects that an ambulance was summoned at 2:23 a.m. Paramedics arrived at 2:29 a.m., but were unable to resuscitate Sallenger. He was transported to the hospital, where he spent 24 hours on life support and was pronounced dead the next day, May 1, 2002.

The Estate filed this action against the City of Springfield and the officers alleging federal constitutional violations and several state-law claims. As is relevant here, the district court entered summary judgment on two of the federal claims: (1) a § 1983 claim against the officers for failing to adequately respond to the medical needs of a prisoner, in violation of the Fourth Amendment; and (2) a *Monell* claim against the City for failure to train its officers in the use of the hobble. Not directly at issue on this appeal but relevant nonetheless is the Estate's excessive-force claim against the officers, which focused primarily on their use of the hobble. The district court denied the officers' motion for summary judgment on that claim, finding they were not entitled to qualified immunity. The officers appealed from this interlocutory order denying qualified immunity, and we upheld the district court's decision. *See Sallenger*, 473 F.3d at 742. That claim (among others) was then tried to a jury, and Sergeant Zimmerman and Officer Oakes

were found not liable. The jury was unable to reach a verdict on the claim against Officer Oliver. But after a retrial, he too was found not liable. The Estate does not contest the jury verdicts on appeal; instead, it challenges only the district court's entry of summary judgment on the medical-care claim against the officers and the *Monell* claim against the City.

## II. Discussion

We review a district court's grant of summary judgment de novo and view all facts and reasonable inferences in favor of the nonmoving party. *King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 816 (7th Cir. 2007). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In reviewing the district court's decision to grant summary judgment, we "consider only those matters that were before the district court when it entered the judgment," not the evidence offered later at trial. *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1024 (7th Cir. 2003) (quotation marks omitted).

### A. The Officers' Alleged Failure to Provide Medical Care

The Estate claimed that Officers Zimmerman, Oakes, and Oliver failed to adequately respond when Sallenger stopped breathing after being hobbled. The Fourth Amend-

ment's objective reasonableness standard applies; the Estate's claim pertains to the medical needs of a person under arrest who has not yet had a judicial determination of probable cause. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007); *see also Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007) ("The governing standard at the time of arrest [for medical-care claims] is the Fourth Amendment's ban on unreasonable seizures."); *Lopez v. City of Chicago*, 464 F.3d 711, 718-19 (7th Cir. 2006). Generally speaking, four criteria are examined to determine whether officers responded reasonably to a detainee's need for medical care: (1) the officer's notice of the detainee's need for medical attention; (2) the seriousness of the need; (3) the nature or scope of the required treatment; and (4) any countervailing police interests, e.g., the need to prevent the destruction of evidence, or other similar law-enforcement interest. *Williams*, 509 F.3d at 403.

It is undisputed that Sallenger stopped breathing within a few minutes of being hobbled; the focus here is on the reasonableness of the officers' response once they realized he was unconscious. The Estate argues that the record supports an inference of a seven-minute gap between the time the officers realized Sallenger was unconscious and the time they began to administer CPR and summon paramedics. This seven-minute lag, the Estate contends, was unreasonably long given the life-threatening nature of Sallenger's medical need. At summary judgment we draw all inferences from the evidence in the Estate's favor, but those inferences must be both reasonable and find support in the record. *See Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The record

does not reasonably support the inference that the officers waited seven minutes before rendering aid.

As we have noted, the Estate's argument rests on the timing of two calls from the scene that appear in the transcript of the police-radio tape recording. As these events were rapidly unfolding, an unidentified officer radioed the following information to the dispatcher at 2:15 a.m.: "[w]hite male, late 30's [sic], unconscious, unresponsive." At 2:22 a.m. Lieutenant Bridges radioed that he was "out at the scene." The Estate suggest that these two calls permits an inference that the officers waited seven minutes before beginning to administer medical care. We disagree.

Without something more, these two calls do not support a reasonable inference that the officers did absolutely nothing for seven minutes after realizing Sallenger was not breathing. And there is nothing in the record to supply the "something more" that is necessary to make such an inference reasonable. To the contrary, all three officers *and* Sallenger's sister, Kim Nolan—the primary witness for the Estate—testified consistently that as soon as the officers realized Sallenger was unconscious, they removed the hobble, began CPR, and summoned an ambulance. This took place immediately after Lieutenant Bridges arrived at the scene. Lieutenant Bridges corroborated this account. He also testified that it would be incorrect to interpret the call log as pinpointing the precise time of his arrival; it established only that at 2:22 a.m. he radioed the dispatcher to report that he had arrived. The log also reflects that paramedics were summoned just one minute later, at

2:23 a.m. Accordingly, all the witnesses agree that the officers administered medical care very soon, if not immediately, after realizing that Sallenger was not breathing; the call log is insufficient to undermine this testimonial unanimity.

The Fourth Amendment requires reasonableness, not immediacy. Everyone agrees that the officers endured a tense and dangerous physical ordeal to subdue and restrain Sallenger, a very large man who was actively psychotic. Events unfolded rapidly: The officers arrived at the home just after 2 a.m., a violent struggle ensued, Sallenger was brought under control and stopped breathing some minutes later, and at 2:23 a.m. paramedics were summoned. On this record, the district court was right to conclude that the evidence does not support the Estate's claim that the officers' response to Sallenger's medical needs was unreasonable. Accordingly, summary judgment was properly entered in favor of the officers on the Fourth Amendment medical-care claim.

**B.  *Monell* Claim Based on Failure to Train**

In *City of Canton v. Harris*, 489 U.S. 378, 387 (1989), the Supreme Court held that in limited circumstances a municipality may be held liable under § 1983 for constitutional violations resulting from a failure to properly train police officers. The Estate's failure-to-train claim is premised mainly on the fact that the City permitted its officers to use hobbles but did not train them in the proper use of this device. But a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee. *See, e.g.,*

*King*, 496 F.3d at 817; *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007).

Two alleged constitutional violations might have formed the basis for *Monell* liability: (1) the claim that the officers used excessive force against Sallenger, resulting primarily from their alleged misuse of the hobble; and (2) the claim that the officers inadequately responded to his medical needs during the arrest. But all three officers were cleared of any constitutional wrongdoing on the excessive-force claim following jury trials; the Estate does not challenge these verdicts on appeal. It is true as a general matter that we review the district court's entry of summary judgment on the *Monell* claim by reference to the evidentiary record made on summary judgment, not at trial. *Hildebrandt*, 347 F.3d at 1024. But the jury *verdicts* are now the law of this case, and they conclusively establish that no excessive force occurred. *See Teague v. Mayo*, 553 F.3d 1068, 1072-73 (7th Cir. 2009). Nor can the medical-care claim against the officers provide an alternative basis for *Monell* municipal liability. For reasons we have already explained, the officers' conduct did not violate the Fourth Amendment. Accordingly, because there is no underlying constitutional violation, the City cannot be liable under *Monell*. *See Jenkins*, 487 F.3d at 492 ("The jury found that Mr. Jenkins' constitutional rights were not violated . . . , thus the City cannot be held liable for any failure to train.").

AFFIRMED.