In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 24-1946

EDWARD C. SNUKIS, JR. and SAMANTHA SNUKIS, Co-Administrators of the Estate of Edward C. Snukis,

*Plaintiffs-Appellants,*

*v.*

MATTHEW O. TAYLOR, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Southern District of Indiana, Evansville Division.
No. 3:21-cv-00135-MPB-MJD — **Matthew P. Brookman**, *Judge.*

———————————

ARGUED FEBRUARY 25, 2025 — DECIDED JULY 28, 2025

———————————

Before SYKES, *Chief Judge*, and KIRSCH and JACKSON-AKIWUMI, *Circuit Judges*.

KIRSCH, *Circuit Judge*. Officers Matthew Taylor and Trevor Koontz stopped Edward Snukis after receiving a dispatch that a man matching his description was impaired and refusing to leave the parking lot of a local business. The encounter quickly turned violent. After Snukis refused commands and struck Officer Koontz, Officer Taylor tased Snukis twice,

Koontz and Taylor pinned him to the ground, and Taylor struck Snukis in the head six times. Officers Taylor, Koontz, and Nicholas Hackworth secured Snukis in handcuffs but then noticed that Snukis had lost consciousness. They immediately called for emergency assistance and monitored his breathing and pulse. When Snukis no longer had a pulse, the officers performed chest compressions until the paramedics arrived. Snukis died later that evening.

Snukis's children—co-administrators of his estate—sued the officers and the City of Evansville. Relevant to this appeal, the estate brought claims under 42 U.S.C. § 1983. The district court granted the defendants' motion for summary judgment. The estate appeals only the claims against the officers. Because the officers' use of force was reasonable considering Snukis's resistance and they provided prompt medical care, we affirm.

I

An employee of a Honda dealership reported to a 9-1-1 emergency dispatcher that an impaired man had repeatedly entered a rear parking lot, was peering into windows, and was refusing to leave. The caller expressed concern that the man would be hit by a passing car.

Evansville police officers Matthew Taylor and Trevor Koontz responded to the call. As they arrived on the scene, both officers activated their bodycams; the footage firmly establishes many of the facts that follow. See *Pryor v. Corrigan*, 124 F.4th 475, 483–84 (7th Cir. 2024) (quotation omitted). In the parking lot they encountered Edward Snukis, who matched the description of the man identified in the 9-1-1 call and appeared to be intoxicated. Officer Koontz approached

Snukis and asked him (twice) to put his hands on his head. When Snukis failed to do so, Officer Koontz grabbed Snukis's arm and told him to turn around. Snukis resisted and a brief struggle ensued. As Snukis tried to get away, he struck Officer Koontz with his arm. Both men fell to the ground. At that point, Officer Taylor fired his taser into Snukis and ordered him to get on the ground with his hands up. When Snukis rolled over and started removing the barbs from his chest, Officer Taylor tased him a second time. Snukis removed the barbs, got up, and fled.

After a brief foot pursuit, Snukis tripped and fell. Officers Taylor and Koontz got on top of Snukis and attempted to handcuff him. Snukis continued to resist: while the officers commanded him to put his hands behind his back, Snukis grabbed at Officer Taylor's genitals, reached for his holster, and took hold of his leg. To get free of Snukis's grasp, Officer Taylor struck Snukis in the head approximately six times. Eventually the officers were able to get Snukis's hands behind his back and handcuff him. A third officer, Nicholas Hackworth, arrived on the scene as Snukis was being secured.

Although Snukis was initially shouting and swearing at the officers when they got on top of him, Snukis became quieter as they struggled to handcuff him. Snukis also began making guttural and snoring sounds. Once Snukis was secured in handcuffs, one of the officers observed that he appeared to be unconscious. The officers turned Snukis over to check that he was still breathing. He was, though he remained unresponsive. An officer began applying sternum rubs and Officer Hackworth called for medical assistance. The officers continued to monitor Snukis's breathing and pulse. When they could no longer detect a pulse, the officers removed his

handcuffs and administered chest compressions until para-
medics arrived. Snukis was pronounced dead later that even-
ing.

Edward Snukis, Jr. and Samantha Snukis are co-
administrators of Snukis's estate. The estate filed this action
against the City of Evansville and Officers Taylor, Koontz, and
Hackworth, asserting various claims under federal and state
law. Relevant to this appeal, the estate brought claims under
42 U.S.C. § 1983 against the officers for violating Snukis's
Fourth Amendment rights. The estate alleged that (1) Officers
Taylor and Koontz used excessive force against Snukis; (2)
Taylor failed to intervene when Koontz used excessive force;
and (3) Officers Taylor, Koontz, and Hackworth failed to
render medical aid. The officers moved for summary
judgment. The district court granted the motion and the estate
appealed.

II

We review the district court's grant of summary judgment
de novo. *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th
Cir. 2005). Summary judgment is warranted if there is no gen-
uine dispute of material fact and the officers are entitled to
judgment as a matter of law. Fed. R. Civ. P. 56(a). In applying
this standard, we view the facts in the light most favorable to
the estate and resolve all disputed issues of fact in their favor.
*Abdullahi*, 423 F.3d at 769. However, "[w]e will not consider
factual arguments that were not raised below nor shall we
consider evidence that was not properly cited to the court be-
low." *Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 849
(7th Cir. 2015). Our review is limited to the reasons for the
district court's decision based on what was argued and pre-
sented to it by the parties. *Id.* at 848–49.

## A

First, we consider the estate's excessive force claim. When an officer uses physical force to restrain an individual, he effects a seizure within the meaning of the Fourth Amendment. *Torres v. Madrid*, 592 U.S. 306, 309 (2021). Determining whether the force the officers used is objectively reasonable under the Fourth Amendment requires a case specific analysis that "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). We consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

The estate challenges three uses of force as excessive: (1) Officer Koontz grabbing Snukis's arm, (2) Officer Taylor tasing Snukis, and (3) Taylor repeatedly striking Snukis in the head. We consider each in turn.

## 1

The estate first argues that, by grabbing Snukis's arm, Officer Koontz immediately and unreasonably escalated to physical force. However, the estate has forfeited this argument by failing to raise it in the district court. See *Packer*, 800 F.3d at 849 ("It is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If it does not do so, and loses the motion, it cannot raise such reasons on appeal.") (quotation and emphasis omitted).

In opposing the motion for summary judgment, the estate failed to explain how Officer Koontz's initial contact was unreasonable. The closest it came to doing so was when the estate argued that the officers' motion did not "address any of the other uses of force by Koontz described elsewhere in this brief." But the estate did not include any reference or citation as to what those other uses of force might be, or explain why those uses of force were unreasonable. In opposing the motion, the estate needed to identify the reasons—legal or factual—why their excessive force claim was viable. Vague references to Officer Koontz's arm grab were not sufficient to alert the district court or the officers that this use of force was a basis for the excessive force claim, so we will not consider the argument on appeal. See *id.*

2

The estate next argues that Officer Taylor's use of his taser was excessive force. Tasers "fall[] somewhere in the middle of the nonlethal-force spectrum." *Abbott v. Sangamon County*, 705 F.3d 706, 726 (7th Cir. 2013). While it may be unreasonable to use a taser against suspects that are passively noncompliant or uncooperative but subdued, courts have generally held that it can be appropriate to use tasers against suspects who are actively resisting officers. *Id.* at 727–28, 730–31 (collecting cases); *Dockery v. Blackburn*, 911 F.3d 458, 467–68 (7th Cir. 2018) (collecting cases). Active resistance includes "kicking and flailing, declining to follow instructions while acting in a belligerent manner, and swatting an arresting officer's hands away while backpedaling." *Dockery*, 911 F.3d at 467 (quotation and citations omitted).

Officer Taylor's two uses of his taser were reasonable. He and Officer Koontz approached Snukis while looking for

someone suspected of minor crimes—a man matching Snukis's description had been trespassing and was potentially under the influence of drugs or alcohol. Snukis then refused Officer Koontz's commands to put his hands on his head. When Officer Koontz attempted to grab Snukis's arm, Snukis struggled to break free of his grasp. He struck Officer Koontz in the process, knocking him to the ground. Officer Taylor then tased Snukis for the first time, but Snukis continued to resist. Snukis rolled over and started to remove the barbs from his chest, ignoring Officer Taylor's commands to stay on the ground with his hands up. Taylor then tased Snukis a second time. "In short, [Snukis's] combative demeanor never changed, and he did nothing to manifest submission." *Id.* at 468; cf. *Abbott*, 705 F.3d at 732 (suspect "fell to the ground and convulsed but made no movement after the first tasing"); *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) (suspect had not violently resisted and was "unarmed and … face down … with his hands underneath him and having already been shocked twice with the Taser"). Given Snukis's active resistance and the physical threat he posed to the officers, Officer Taylor's decisions to tase Snukis were objectively reasonable attempts to gain control and prevent the encounter from escalating further.

The estate says it is disputed whether Snukis punched or struck Officer Koontz because the blow is not shown in the video evidence. But because the estate did not challenge this factual assertion in the district court, it is forfeited on appeal. *Packer*, 800 F.3d at 848–49. Regardless, the estate does not provide any evidence that would create a genuine dispute. See Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact … is genuinely disputed must support the assertion by … citing to particular parts of materials in the record …."). The contact at

issue is also clear enough in Officer Taylor's bodycam footage: the two were grappling with one another, Snukis's arm came into forceful contact with Koontz's upper body, and the two men then fell to the ground.

3

Finally, the estate argues that Officer Taylor used excessive force when he struck Snukis in the head six times while Snukis was on the ground. The estate contends that Officer Taylor should have paused between blows to give Snukis time to comply with his commands.

For Officer Taylor's strikes to be excessive, he must have used greater force than was reasonably necessary to subdue Snukis. *Abbott*, 705 F.3d at 724. "Force is reasonable only when exercised in proportion to the threat posed, and as the threat changes, so too should the degree of force." *Cyrus*, 624 F.3d at 863 (citation omitted). However, we do not require officers to alter the degree of force they use "at the precise second" the threat changes. *Brumitt v. Smith*, 102 F.4th 444, 448 (7th Cir. 2024); see also *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) ("The Fourth Amendment requires reasonableness, not immediacy."). When officers are forced to make "split-second judgments" in "tense, uncertain, and rapidly evolving" circumstances, we give them considerable leeway "about the amount of force that is necessary" to subdue a suspect. *Graham*, 490 U.S. at 396–97.

Given the threat posed by Snukis, Officer Taylor's use of force was a reasonable means of gaining control. When Officer Taylor punched him, Snukis was struggling beneath the officers: he was refusing their commands, grabbing at Taylor's genitals and holster, and actively gripping Taylor's inner

thigh. Prior attempts at pain compliance had not deterred Snukis. Even after officers had tased him twice and pinned him to the ground, Snukis continued to actively resist. It was reasonable, then, for Officer Taylor to believe that significant force was necessary to subdue Snukis, and there is no evidence that Taylor continued striking Snukis after he released his grip on Taylor's inner thigh. We will not second guess Officer Taylor's split-second judgment under these circumstances. *Graham*, 490 U.S. at 396–97. Nor did Officer Taylor need to interrupt his delivery of force to give Snukis time to comply between each strike. See *Brumitt*, 102 F.4th at 448. Snukis had several opportunities to comply with the officers' commands but forcefully refused, putting the officers and himself at risk of further harm.

On appeal, the estate disputes that Snukis grabbed at Officer Taylor. The estate argues that this was impossible because one of Snukis's hands was trapped underneath him and Officer Koontz had control of the other one. But the fact that Officer Koontz had control of Snukis's hand at one point in the encounter does not show that Snukis did not grab at Officer Taylor. Regardless, the estate did not challenge this factual assertion in the district court, so it is forfeited on appeal. *Packer*, 800 F.3d at 848–49. Because Snukis was actively resisting the officers, the cases the estate cites involving no resistance or only passive resistance are inapposite. See *Frazell v. Flanigan*, 102 F.3d 877, 884–85 (7th Cir. 1996); *Lester v. City of Chicago*, 830 F.2d 706, 714 (7th Cir. 1987); *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1043 (7th Cir. 2002).

B

The estate next contends that Officer Taylor failed to intervene to prevent Officer Koontz from using excessive force.

Because the estate does not have a viable excessive force claim against Officer Koontz, this claim fails as well. See *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) ("In order for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation ….").

C

The estate's final § 1983 claim concerns the officers' failure to render medical aid. Officers violate a suspect's Fourth Amendment rights when their response to his medical needs is objectively unreasonable. *Horton v. Pobjecky*, 883 F.3d 941, 953 (7th Cir. 2018). In assessing the reasonableness of an officer's response, we consider four factors: "(1) whether the officer had notice of the medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) police interests that might inhibit providing treatment." *Id.* The Fourth Amendment requires a reasonable response, not an immediate one, *Sallenger*, 630 F.3d at 504, and the reasonableness inquiry "takes into account the sufficiency of the steps the officers did take," *Florek v. Village of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011).

We find that the officers' response to Snukis's medical emergency was prompt and appropriate. The officers noticed that Snukis appeared to be unconscious seconds after he was secured in handcuffs. They immediately turned him over, applied sternum rubs, and called for medical assistance. As they waited for help, they continued to monitor Snukis's pulse and breathing. When he no longer had a pulse, they took the handcuffs off and applied chest compressions until paramedics arrived. We have held that similar responses satisfy the Fourth Amendment. See *Sallenger*, 630 F.3d at 502, 504 (officers began CPR and summoned ambulance as soon as they

realized suspect was not breathing); *Florek*, 649 F.3d at 597, 601 (officers promptly called for an ambulance after learning of suspect's chest pains but did not administer medical treatment themselves).

The estate raises two issues with the officers' response. First, the estate faults the officers for failing to attend to Snukis's medical needs until they had him handcuffed. In their view, the officers were on notice that Snukis needed medical care when he began making guttural and snoring sounds. Even if we assume these sounds were sufficient to put a reasonable officer on notice of Snukis's medical need, the officers had a countervailing interest in securing him before providing medical care. Snukis was fighting with the officers even after he had been pinned to the ground. It was reasonable for them to first ensure that he would not present a continuing threat before they administered first aid. See *Horton*, 883 F.3d at 954 (holding that it was objectively reasonable for an officer to delay medical care where armed suspects were still at large). Moreover, the officers began attending to Snukis less than one minute after the estate argues that it was obvious Snukis was in medical distress. That is not an unreasonable amount of time given the circumstances. Our decision in *Sallenger* is instructive:

> Everyone agrees that the officers endured a tense and dangerous physical ordeal to subdue and restrain Sallenger, a very large man who was actively psychotic. Events unfolded rapidly: The officers arrived at the home just after 2 a.m., a violent struggle ensued, Sallenger was brought under control and stopped breathing some minutes later, and at 2:23 a.m. paramedics

> were summoned. On this record, the district court was right to conclude that the evidence does not support the Estate's claim that the officers' response to Sallenger's medical needs was unreasonable.

630 F.3d at 504.

Second, the estate argues that the officers unreasonably delayed performing chest compressions on Snukis for about four minutes after he was secured. Bodycam footage shows that the officers repeatedly checked Snukis's vital signs, however, and began CPR within one minute of losing his pulse. This case isn't like *Bradich ex rel. Estate of Bradich v. City of Chicago*, 413 F.3d 688 (7th Cir. 2005), because the officers here provided care and called for medical help quickly. See *id.* at 690–92 (finding that a ten minute delay in seeking care for an inmate who had stopped breathing was deliberate indifference). It was reasonable to not perform chest compressions on a suspect that had a pulse and was still breathing, and the officers provided care and called for an ambulance as soon as they learned of Snukis's medical emergency.

AFFIRMED